IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| BOARD OF EDUCATION OF<br>MAHOMET-SEYMOUR COMMUNITY<br>SCHOOL DISTRICT NO. 3,<br><br>Plaintiff,<br><br>v.<br><br>S.W. and K.W., individually and as parents and<br>Next friends of D.W., a minor, and the<br>ILLINOIS STATE BOARD OF EDUCATION,<br><br>Defendants. | Case No. 2:18-cv-2146<br><br>Judge Colin Stirling Bruce |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

*I. Undisputed Material Facts*

The following paragraphs of Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's Statement") are conceded to be undisputed and material: 1, 2, 3, 4, 6, 8, 9, 12, 14, 15, 34, 54, 58, 59, 60, 61, 63, 64, 65, 73, 78, 79, 88, 90, 91, 92, 93, 94, 95, 96, 97, 100, 107, 108, 110, 112, 113, 114, 115, 116, 118, 119, 120, 121, 122, 123, 124.

Paragraph 91 is conceded to be undisputed and material, but Defendants wish to clarify that when Dr. Hunter recommended "a small, highly managed, behaviorally supported mainstream classroom" he was envisioning either a special education classroom within a general education school with opportunities for mainstreaming or a mainstream classroom as D.W.'s "least restrictive opportunity." (R. at pt. 13, pg. 2129)

Paragraph 93 is conceded to be undisputed and material, but Defendants wish to clarify that after Dr. Hunter testified that D.W. needed a "therapeutic support element" in his education, he later explained that the "key component is a behavior analyst in addition to working with a

clinician." (R. at pt. 13, pg. 2136)  This is precisely the relief ordered by the Impartial Hearing Officer ("IHO"). (R. at pt. 1, pg. 120)

Paragraphs 108, 110, 112, 113, 114, 115, and 116 contain summaries of opinion testimony given by District staff. Although the validity of these opinions is disputed, it is undisputed that District staff expressed these opinions in their testimony.

## II. Disputed Material Facts

The following paragraphs of Plaintiff's Statement are conceded to be material, but are disputed:

Paragraph 7.  This list of D.W.'s diagnoses is disputed because it omits the word "mild" from his diagnosis of "Mild Neurocognitive Disorder" (R. at pt. 4, pg. 519.)   Also, the citation in paragraph 7 of Plaintiff's Statement is to a letter from Dr. Morton that does not include the diagnosis of intermittent explosive disorder.  It is undisputed that D.W. has received the other diagnoses listed in paragraph 7.

Paragraph 10.  It is a broad overgeneralization to say that D.W.'s behavior has worsened "over time."  In fact, D.W. was making behavioral progress for most of his second grade year. In a note dated April 10, 2017 District Behavior Interventionist Megan Hunter wrote, "[D.W.] has engaged in socially appropriate behaviors with peers and has built positive relationships with peers and staff during the 2016-2017 school year.  He was able to follow school rules for a majority of the 2016-2017 school year." (R. at pt. 3, pg. 422).  Also, D.W. has not used school supplies as weapons and the page cited in Paragraph 10 of Plaintiff's Statement makes no mention of weapons.  It does describe an incident in which D.W. threw "two chairs."  This incident was the subject of an earlier expedited due process hearing in which the IHO ruled that a chair and pea gravel could not be construed as weapons under IDEA for the purpose of justifying

a 45-day unilateral change of placement to an interim alternative educational setting and ordered D.W. returned to his neighborhood elementary school.. (See ISBE Decision No. 2018-0106 attached as Exhibit A.)

Paragraph 11.  The page cited in paragraph 11 of Plaintiff's Statement does not contain any reference to D.W.'s academic progress nor to any injury.  There is little data in the record regarding D.W.'s academic progress "throughout the latter part of second grade" because he was improperly excluded from school for almost the entire time between March 31, 2017 and the due process hearing under review by this Court.  D.W. did, however, make progress in speech and occupational therapy during the summer of 2017.  (R. at pt. 4, pgs. 528, 542)  The allegation that D.W.'s struggles continue "until today" is vague and asks the Court to consider events subsequent to the decision of the IHO.

Paragraph 13. Defendants dispute the characterization of these incidents as "extreme."

Paragraph 22. This paragraph, which contains no citation to the record, is a conclusory overgeneralization and Defendants dispute it for the same reasons explained above in their response to paragraph 10.

Paragraph 32.  The citation to the record in this paragraph of the Plaintiff's Statement shows only that these supports were written in D.W.s behavioral intervention plan ("BIP").  The extent to which these supports were implemented with fidelity is disputed and was the subject of extensive testimony. The token economy was not individualized until March 9, 2017. (R. at pt. 3, pg. 408; R. at 11, pgs. 1630-32) The District staff working with D.W. did not effectively de-escalate by avoiding frequent verbal prompts. (R. at pt. 13, pgs. 1872-73) The IHO found for the parents on the issue of whether the District provided an appropriately trained and experienced aide to manage D.W.'s behaviors. (R. at pt. 1, pgs. 117-18)

Paragraph 33.  It is undisputed that the District provided an aide, but it is disputed whether the aide was appropriately trained and experienced in managing behaviors related to a student's disabilities.  Principal Mark Cabutti testified that Ms. Stevens served as an academic support aide and the burden of providing behavioral support fell upon the classroom teacher. (R. at pt. 12, pgs. 1820-22)  The IHO found for the parents on the issue of whether the District provided an appropriately trained and experienced aide to manage D.W.'s behaviors. (R. at pt. 1, pgs. 117-18)

Paragraph 44.   Plaintiff's claim that D.W.'s academic progress stopped "during this period" is vague, but it is clear from the context of the cited testimony that the period of time in question was February 17, 2017 to March 31, 2017, a period that included Spring Break.  (R. at pt. 13, pg. 1891, 2023)

Paragraph 45.  It is clear even from the progress reports cited by the Plaintiff in this paragraph that D.W. was making progress on his goals through February 17, 2017-- most of his second grade year.  (R. at pt. 4, pgs. 554-60) School Social Worker Julie Ditmars also testified at length about the progress that D.W. was making on his goals related to building positive relationships with his peers. (R. at pt. 13, pgs. 2007-08)

Paragraph 62.  It is undisputed that District staff testified that the goal of D.W.'s placement at a TDS was that he would one day return to the general education classroom.  The credibility of this testimony is disputed. (R. at pt. 13, pg. 2057)

Paragraph 89.  D.W's mother did provide consent for District staff to provide written records to Dr. Hunter on June 20, 2017, prior to the completion of D.W.'s evaluation.  (R. at pt. 13,  pg. 2149).  D.W.'s mother also provided consent for conversation between Dr. Hunter and District staff during and after the August 10, 2017 IEP meeting.  (R. at pt. 13, pgs 2060-61)

Paragraph 98. Plaintiff dismissively mischaracterizes non-contingent reinforcement ("NCR") as "playing games" with no demands for school work. In fact, Dr. Falcomata's report indicates that D.W.'s preferred activities were to be "identified via systematic preference assessment" and that NCR is a "short term transitional strategy" after which academic demands would be "faded into his schedule" (R. at pt. 5, pgs. 642-43)

Paragraph 99. The testimony referenced in this paragraph was given by Dr. Falcomata in response to a hypothetical created by Counsel for the Plaintiff during cross-examination. In the hypothetical, D.W. throws something while in the general education classroom. But Dr. Falcomata did not recommend starting the NCR treatment in the general education classroom. On the same page in the Record he said that the classroom setting "will be determined by how he responds initially." Before Counsel for the Plaintiff changed the facts of the hypothetical, Dr. Falcomata had created one of his own: "if he starts out in the OT room…and he requests to go to the resource room…he might want to go the gen. ed. classroom…" In those circumstances, Dr. Falcomata said he would not recommend restricting his access to the general education classroom unless D.W. demonstrated problem behavior in that setting. (R. at pt. 13, pg. 2187) The IHO concluded from Dr. Falcomata's testimony that NCR "can be implemented within the student's public school in a room dedicated to the student and behavioral therapist." (R. at pt. 1, pg. 114)

Paragraph 101. Dr. Falcomata did not recommend that District staff wear protective gear, but that they have it accessible for situations in which aggression may emerge. (R. at pt. 13, pg. 2184) Defendants dispute the characterization of D.W.'s behavior as "so intense." In fact, this testimony regarding protective gear was immediately preceded by a discussion of the intensity of

D.W.'s behaviors in which Dr. Falcomata called them "fairly intense," "maybe past the median," and "not as severe and intense as others I've worked with." (R. at pt. 13, pgs. 2182-83)

Paragraph 109.  Ms. Johnson did not make a general statement that "D.W.'s behaviors are the worst she has ever seen." Ms. Johnson was only referring to one behavioral incident she observed on September 5, 2017.  (R. at pt. 12, pg. 1733)

Paragraph 111.  Although Ms. Lamb did testify that D.W's second grade classmates were afraid of him, she went on to clarify that "he was a great friend, a great kid, but they were scared to see his behavior towards their teacher."  And she testified that "they also loved him." (R. at pt. 13, pg. 2021)

Paragraph 117.  This testimony from Ms. Collman was given at the previous expedited due process hearing on October 23, 2017.  Her testimony was given in response to questions about a single behavioral incident that occurred on September 5, 2017.  Because D.W. was improperly removed from school following this incident, Ms. Collman had only served as D.W.'s aide for six school days at the time of the testimony referenced in this paragraph of the Plaintiff's Statement.  (R. at pt. 10, 1487, 1520)

### III. Disputed Immaterial Facts

Paragraph 5. D.W. was a third grade student at Lincoln Trail Elementary at the time of the January 29, 2018 administrative decision under review by this Court.  D.W. has not been attending Lincoln Trail Elementary since January 24, 2019 because at an IEP meeting convened on that date the District stated they would no longer allow him to attend school.   This fact, however, is immaterial to the issue of whether Independent Hearing Officer ("IHO") erred in her decision because it occurred after the decision and because this Court has already ruled in this

matter that it "must review the hearing officer's decision based on the information available to her at the time she issued her decision."

Paragraph 19. Whether the token economy system was implemented and when it was individualized for D.W.'s needs is in dispute and was the subject of extensive testimony at the hearing. (R. at pt. 13, pg. 1857; R at pt. 11, pgs. 1630-32) Nevertheless, this fact is immaterial because even if the District provided this accommodation, this does not show that the IHO erred when she concluded that the District denied D.W. a free and appropriate public education ("FAPE") by failing to conduct a new functional behavior assessment ("FBA") when his behaviors became dysregulated toward the end of his second grade year. In fact, the IHO found for the district on this issue of implementing the token economy, but still held that the failure to conduct an FBA resulted in a denial of FAPE. (R. at pt. 1, pgs. 116-17)

Paragraph 24. Ms. Hood did take these safety precautions, but this was not a response to behaviors she had witnessed from D.W. in her classroom. Rather, she testified that she made these changes in July of 2016 before D.W. was a student in her classroom. (R. at pt. 11, pgs. 1613-14) Nevertheless, this fact is immaterial because it does not bear directly on the question of whether the IHO erred when she ruled that the failure to complete a new FBA at the end of second grade denied D.W. a FAPE.

Paragraph 29. The pages of the record cited in this paragraph of Plaintiff's Statement do not support the claim that D.W. did not have to do certain lessons "if he did not feel like it." The decision to exempt D.W. from music was a sensory accommodation agreed to by the IEP team in May 2016. (R. at pt. 4, pg. 495) This fact, however, is immaterial because it does not bear directly on the question of whether the IHO erred when she ruled that the failure to complete a new FBA at the end of second grade denied D.W. a FAPE.

Paragraphs 36, 37, 38, 39, 40, and 52.  In these paragraphs, Plaintiff is overstating the intensity of D.W.'s behaviors.  The specific facts disputed will be listed below, but all of these facts are immaterial because the presence of disruptive behaviors in the classroom indicates the need for a new FBA, not a change to a more restrictive placement.  A list of disruptive behavioral incidents does not bear directly on the question of whether the IHO erred when she ruled that the failure to complete a new FBA at the end of second grade denied D.W. a FAPE.

Paragraph 36.  Ms. Hood did not testify that D.W. used educational materials as weapons.  She did testify that he unwound paper clips and pulled the metal strip out of a ruler.  But she clarified, "I'm not saying he ran around and poked someone with it."  (R. at pt. 11, pg. 1664)  D.W. used these items to dig at his desk or scratch surfaces, possibly as a result of his interest in the video game Minecraft.  (R. at pt. 11, pg. 1663, 1681)

Paragraph 37.  Ms. Hood did testify that in second grade D.W. would lift chairs over his head and look at her as a way of getting her attention.  She testified that he did throw chairs in her classroom, but not at other people.  (R. at pt. 11, pg. 1669-70)

Paragraph 38.  The "rocks" that were thrown at Ms. Hood were two pieces of pea gravel commonly used to cover the ground of elementary playgrounds to cushion a child's fall.  The IHO asked at the end of the first day of hearing to be provided with a couple of pieces of pea gravel.  When Ms. Hood testified that D.W. had thrown rocks at her and that she had not been harmed by the two pieces of pea gravel, the IHO interrupted and asked, "I'm sorry, is that what this little thing is?" (R. at pt. 11, pgs. 1641, 1606, 1665, 1642, 1667). Ms. Northrup, the Special Education Director, even testified that the two pieces of pea gravel were not within"[the legal] definition of a weapon" and that D.W. "didn't have that kind of weapon." (R. at pt. 10, pg. 1548)

Paragraph 39.  Ms. Hood's "desk" was a kidney-shaped table that she would sit at with students and D.W. was allowed to use the space under the table as a "reset zone."  She testified, "I was okay with him being under there…it wasn't a problem at that time."  Eventually he did try to lift the table up and to stand on it and the table was removed.  (R. at pt. 11, pg. 1673)

Paragraph 40.  The citation to the record in this paragraph of Plaintiff's Statement refers to a leading question asked by Counsel for the District while cross-examining the neuropsychological evaluator, Dr. Hunter.  He answered that he was not aware that this had happened. (R. at pt. 13, pg. 2139)  If this fact is alleged elsewhere in the record, Defendants are unaware of it and therefore dispute that this incident even occurred or, if it occurred, is related to D.W.'s behavior.

Paragraph 52. Defendants dispute the characterization of a second grader's desire for his teacher's attention as "an unhealthy obsession." Ms. Hood did testify that D.W., on various occasions, threw push pins, pencils, and pea gravel at her.  Defendants dispute the characterization of these items as weapons.  (R. at pt. 11, pgs. 1663-64)

Paragraph 66.  This is another conclusory overgeneralization without citation to the record and Defendants again dispute it.  These third grade incidents are also immaterial because in August 2017 the District still had not completed a new FBA.  (R. at pt. 3,  pg. 411)  A list of disruptive behavioral incidents does not bear directly on the  question of whether the IHO erred when she ruled that the failure to complete a new FBA denied D.W. a FAPE.

Paragraphs 74, 75, 76, and 77.  All of the behavior incidents described in these paragraphs occurred after the five day disclosure date of December 4, 2017. (R. at pt. 6, pg. 858) Defendants dispute these anecdotal reports created by the District and provided to parents during the hearing. (R. at  pt. 13, pg. 2084).  The specific facts disputed will be listed below, but all of

these alleged facts are immaterial because the independent FBA ordered by the IHO after the October 2017 hearing still had not been completed at the time of these incidents. Whether D.W. continued to exhibit challenging behaviors at this time does not bear directly on the question of whether the IHO erred when she ruled that the District should have conducted a new FBA and should implement the recommendations of the independent board certified behavior analyst ("BCBA") before considering a change to a more restrictive placement.

Paragraph 74. Special education teacher Ms. Shickedanz admitted during cross-examination that recommended de-escalation strategies were not followed on December 8, 2017. (R. at pt. 13, pgs. 1871-73)

Paragraph 75. Defendants do not dispute that, on the second day of the due process hearing, District staff made the decision to call the police on D.W., a nine year-old boy. (R. at pt. 13, pg. 2059) This was the first time that District staff felt it was necessary to contact the police and no one had advised school staff to call the police during the episode in question on that day. (R. at pt. 13, pg. 2064) Defendants dispute the necessity of this police involvement and believe that the timing of this call to the police during the hearing undermines the credibility of the testimony of District staff regarding these incidents. When asked what the police could possibly do for a nine year-old student, Christine Northrup, the Director of Special Education, responded "[calling the police] stops them in their tracks a bit." (R. at pt. 13, pg. 2064) Furthermore, D.W.'s parent, Mrs. Woolridge, testified her belief that the school's choice to call the police "just continues to enhance his fear of school" after D.W. told his mother that his interaction with the police was scary. (R. at pt. 13, pgs. 2085-86, 2148)

Paragraphs 81, 83, 86 and 87 are immaterial to a determination of the issues raised by Plaintiff in its Motion for Summary Judgment and are not referenced in Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment.

Paragraph 81.  Dr. Morton did not himself diagnose D.W. with all these diagnoses, he merely listed his active diagnoses on the top of one of his letters to the District.  (R. at pt. 13, pg. 1955)

Paragraph 83. Dr. Morton's September 29, 2017 letter to the District, in which he advised against the use of restraint and against the change to a more restrictive placement, contains a list of D.W.'s active diagnoses. (R. at pt. 8, pg. 1169) Counsel for the Plaintiff asked during cross-examination whether D.W.'s parent asked Dr. Morton to omit any of his diagnoses from this list. Dr. Morton answered no and explained that this list auto-populates from the electronic medical record system used by the hospital.  Diagnoses made by doctors outside that hospital system would not be included in that electronically generated list.  (R. at pt. 13, pgs. 1959-1960, 1967)

Paragraph 86.  Dr. Morton did not say that he was not aware that D.W. was diagnosed with intermittent explosive disorder ("IED") at the time he wrote his September 29, 2017 letter to the school.  He said that IED was not one of his diagnoses for D.W. and that, at the time of his testimony, he did not recall whether it was one of the diagnoses listed in Dr. Hunter's neuropsychological evaluation.

Paragraph 87. Although Dr. Morton had not communicated with District staff regarding D.W. behaviors, he testified that he was made aware of these behaviors by D.W.'s mother and that he found her "trustworthy" and "a better historian than many parents." (R. at pt. 13, pg. 1961).

Paragraph 102.  Dr. Falcomata recommended the use of NCR and said that the amount of time before introducing work demands could be as short as a week but could be longer given the amount of time D.W. had been out of school. (R. at pt. 13, pg. 2177)  It is immaterial that he could not "guarantee" success because no professional is going to guarantee that a behavior management strategy is going to be effective or provide a concrete timeline for how long the change in behavior will take. The fact that a behavioral support is not guaranteed to work does not show that the IHO erred when she ordered that it should have been attempted before changing D.W.'s placement to a more restrictive environment.

Paragraph 103.  It is immaterial that it is possible to implement NCR in a therapeutic day school because this is not the placement that Dr. Falcomata recommended for D.W. Dr. Falcomata recommended in his report "contemplation of the fact that (a) the least restrictive behavioral intervention (i.e., NCR/enriched environment) has not yet been attempted and evaluated" (R. at pt. 5, pg. 647).

## IV. Undisputed Immaterial Facts

The following paragraphs of Plaintiff's Statement are conceded to be undisputed but are claimed to be immaterial: 16, 17, 18, 20, 21, 23, 25, 26, 27, 28, 30, 31, 35, 41, 42, 43, 46, 47, 48, 49, 50, 51, 53, 55, 56, 57, 67, 68, 69, 70, 71, 72, 80, 82, 84, 85, 104, 105, 106.

Paragraphs 16, 17, 18, 20, and 21 are immaterial because the fact that the District provided some behavior supports and accommodations for D.W. in kindergarten and first grade does not show that the IHO erred when she concluded that the District denied D.W. a FAPE by failing to conduct a new FBA when his behaviors became dysregulated toward the end of his second grade year.

Paragraphs 23, 25, 26, 27, 28, 30, and 31 are immaterial because the fact that the District implemented many of the accommodations provided in his IEP during his second grade year does not show that the IHO erred when she concluded that the District denied D.W. a FAPE by failing to conduct a new FBA when his behaviors became dysregulated toward the end of his second grade year.

Paragraphs 35, 41, 42, 43, and 46 are immaterial because the fact that D.W.'s behaviors began to increase during second grade only supports the IHO's conclusion that the District should have provided a new FBA. The fact that the District did attempt to provide many things does not change the fact that they failed to provide the one thing most needed.

Paragraphs 47, 48, 49, 50, 51, and 53 are immaterial because the presence of disruptive behaviors in the classroom indicates the need for a new FBA, not a change to a more restrictive placement. All of the incidents described in these paragraphs occurred in March 2017 over a span of only 15 school days. (R. at pt. 5, 704-706; pt 6, pg. 707) A list of disruptive behavioral incidents does not bear directly on the question of whether the IHO erred when she ruled that the District should have conducted a new FBA and should implement the recommendations of the independent board certified behavior analyst ("BCBA") before considering a change to a more restrictive placement.

Paragraphs 55, 56, and 57 are immaterial because the fact that a therapeutic day school has a lower staff to student ratio does not show that the IHO erred when she ruled that the District should have conducted a new FBA and should implement the recommendations of the independent board certified behavior analyst ("BCBA") before considering a change to a more restrictive placement.

Paragraphs 67, 68, 69, 70, 71, and 72 are immaterial because at the beginning of 3rd grade the District still had not completed a new FBA. (R. at pt. 3, pg. 411) A list of disruptive behavioral incidents does not bear directly on the question of whether the IHO erred when she ruled that the failure to complete a new FBA denied D.W. a FAPE.

Paragraphs 80, 82, 84, 85, 104, 105, and 106 are immaterial to a determination of the issues raised by Plaintiff in its Motion for Summary Judgment and are not referenced in Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment.

***V. Additional Material Facts***

125. IHO Mary Schwartz has been an ISBE-appointed hearing officer since 2005. She has worked with children with disabilities and their families throughout her career as an attorney and a licensed clinical professional counselor. She received her master's degree from the University of Chicago in educational psychology and her juris doctorate from Valparaiso University School of Law. https://www.isbe.net/Documents/dp_hearing_officers.pdf

126. The IHO's 25 page decision was based upon thorough consideration after five days of testimony. (R. at pt. 1, pgs. 98, 100)

127. The IHO did not fail to consider the testimony of District staff, but gave due weight to their descriptions of D.W.'s disruptive behaviors. (R. at pt. 1, pgs. 104-105, 111-112)

128. The IHO did not overlook the testimony of District staff regarding the accommodations that they provided for D.W. (R. at pt. 1, pgs. 103-104) In fact, the IHO found for the District on the issue of whether they implemented his IEP by providing a token economy and a reset space, but still held that the failure to conduct an FBA resulted in a denial of FAPE. (R. at pt. 1, pgs. 116-118)

129. Dr. Scott Hunter, neuropsychologist, and Dr. Terry Falcomata, BCBA-D, were both independent experts, mutually agreed upon by the Parties to conduct evaluations of D.W. (R. at pt. 1, pgs. 85-86)

130. Dr. Scott Hunter is a Professor of Psychiatry and Behavioral Neuroscience at the University of Chicago. He received his Ph.D in Clinical and Developmental Psychology in 1996 and has worked continually in the field, assessing over 3,000 children at the request of school districts. (R. at pt. 9, pg. 1309; R. at pt. 13, pg. 2117)

131. Dr. Terry Falcomata received a Ph.D in School Psychology from the University of Iowa in 2008. He is an Associate Professor of Autism and Developmental Disabilities in the Special Education Department at the University of Texas at Austin. (R at pt. 13, pg. 2155)

132. Dr. Falcomata has published numerous scholarly papers on the topic of behavior analysis and has served on the Board of Editors for several scholarly journals including the Journal of Applied Behavior Analysis. (R. at pt. 13, pgs. 2157-59)

133. Dr. Falcomata testified that the District staff he interviewed did not give consistent descriptions of D.W.'s token reinforcement systems and he wrote in his report of classroom observations that "[c]onsistent or clear use of the token reinforcement systems was not readily evident throughout the day." (R. at pt. 13, pg. 2161; R. at pt. 5. pg. 640)

134. Dr. Falcomata testified that the actions of District staff were reinforcing D.W.'s problem behaviors during the incident he observed on December 13, 2017. (R. at pt. 13, pg. 2194)

135. Dr. Falcomata recommended the use of NCR as it is "the least restrictive, most reinforcement heavy approach to problem behavior" available. (R. at pt. 13, pg. 2192) He also said that the amount of time before introducing work demands could be as short as a week but could

be longer given the amount of time D.W. had been out of school. (R. at pt. 13, pg. 2177) Dr. Falcomata explained that the use of NCR was advantageous relative to other available interventions because "it has a built-in increased likelihood that there's going to be positive effects initially." (R. at pt. 13, pg. 2176) NCR will also likely result in fewer behavioral outbursts ("extinction bursts") than the other behavioral interventions available and while D.W.'s behaviors wouldn't "drop straight to zero with NCR," the decreases typically happen quickly. (R. at pt. 13, pg. 2193)

136. Dr. Falcomata testified that NCR can be implemented in a typical school with general education. (R. at pt. 13, pg. 2181)

137. In addition to the two independent experts, another BCBA, Jen Frakes, was retained by D.W.'s parents to observe him at school and to review behavior data from the District. (R. at pt. 13, pg. 1899)

138. Ms. Frakes testified that the replacement behaviors in D.W.'s BIP were not appropriate and that the school's practice of suspending D.W. was reinforcing problem behavior. (R. at pt. 13, pg. 1901)

139. Ms. Frakes, while reviewing the report of a behavioral incident that occurred on December 8, 2017, also testified that the actions of staff were reinforcing problem behaviors and that staff were not prompting D.W. to adopt replacement behaviors, such as taking a break. (R. at pt. 13, pg. 1904)

140. Megan Hunter, the District's behavior interventionist, is not a BCBA. (R. at pt. 13, pg. 1949)

141. D.W.'s behavior at the beginning of second grade was so positive that on August 23, 2016 the IEP team informed his parents of "the plan to not implement every aspect of the

BIP until the team deems it necessary and appropriate." But they assured his parents that the plan was ready to go if needed. (R. at pt. 3, pg. 441)

142. An individualized token economy was not added to the BIP until March 9, 2017. (R. at pt. 3, pg. 444)

143. Ten school days later, on March 31, 2017, the District suspended D.W. and then referred him to a 45-day interim alternative educational setting. (Undisputed ¶ 54)

144. At this time, a new FBA had not been completed. Instead of completing the FBA before referring D.W. to a more restrictive setting, the District intended to complete the FBA at the therapeutic day school. (R. at pt. 3, pg. 411)

145. IHO Schwartz thoroughly reviewed the report of the evaluation conducted by Dr. Hunter in June 2017. (R. at pt. 1, pg. 106-109)

146. Based on Dr. Hunter's report and testimony, the IHO found that D.W. needed "a full time aide who is experienced in ABA" and that it was "very important" for D.W. to have access to typically developing peers. (R. at pt. 1, pg. 108)

147. The IHO found that Dr. Hunter, while participating in the August 10, 2017 IEP meeting, recommended placement in a highly structured general education setting with pull out services. (R. at pt. 1, pg. 109; R. at pt. 3, pg. 413)

148. The IHO found that the District members of D.W.'s IEP team disagreed not only with Dr. Hunter's placement recommendation, but also with his recommendation regarding D.W.s primary eligibility category. Dr. Hunter stated that D.W.'s primary diagnosis was neurological and that without this disorder he would not exhibit problem behavior. Nevertheless, the District changed D.W.'s primary eligibility to Emotional Disability, stating that "his behavior is most impacting his ability to function in a general education setting." (Id.)

149. Based on the testimony of Dr. Morton, D.W.'s developmental pediatrician, the IHO found that "restraint and seclusion should not be used with this student because doing so "would create an unacceptable crisis of anxiety." (R. at pt. 1, pg. 110)

150. Based on the testimony of the principal of the private therapeutic day school recommended by the District, the IHO found that the school has a seclusion room and that it would not accept the student if he has a restriction on restraint. (R. at pt. 1, pg. 109-110)

151. The IHO thoroughly considered the report and testimony of Dr. Terry Falcomata. (R. at pt. 1, pgs. 112-115)

152. The IHO found Dr. Falcomata to be both independent and highly qualified (R. at pt. 1, pg. 112)

153. Based on the report of Dr. Falcomata, the IHO found that District staff did not make consistent use of token reinforcement. (R. at pt. 1, pg. 113)

154. Based on the report of Dr. Falcomata, the IHO found that District staff failed to conduct a formal/systematic preference assessment, which would increase the probability that reinforcers actually function as reinforcers. (Id.)

155. The IHO found that District staff "assertions that the student's behaviors are unpredictable and hard to indentify is contrary to Dr. Falcomata's observation and data collection. (R. at pt. 1, pg. 114)

156. The IHO did not fail to consider Dr. Falcomata's caution that the NCR program "may not initially prevent problem behaviors that may be related to attempts to produce transitions from school to home." (R. at pt. 1, pg. 115)

157. The IHO found that the NCR program recommended by Dr. Falcomata is "intended to be a relatively short-term, transitional strategy" and can be implemented within the student's

current public school in a room dedicated to the student and behavioral therapist.  (R. at pt. 1, pg. 114)

158.  The IHO concluded, therefore, that the "District's concern that the NCR program could not be safely implemented in a third grade classroom and that the student would be endlessly playing at his desk is misplaced." (R. at pt. 1, pg. 119)

                    Respectfully submitted,

                    /s/__Olga Pribyl__
                      One of the Attorneys for Defendants

July 12, 2019

Olga Pribyl
Mike Shea
EQUIP FOR EQUALITY, INC.
20 North Michigan, Suite 300
Chicago, IL 60602
(312) 341-0022

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he has caused the foregoing DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS to be filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record this 12th day of July, 2019:

Darcy Kriha
Kriha Law, LLC
2 Transam Plaza, Suite 450
Oakbrook Terrace, IL 60181
(708) 921-3410
darcy@krihalaw.com

                                                /s/__Olga Pribyl_____
                                                  One of the Attorneys for Defendants